PRO YO STY, C. J.
Plaintiff constructed a garage for defendant, under contract, in the city of Shreveport, and now demands payment for extras put into the structure.
As the building was destined to be leased to the Wheless-Wilson Auto Company, the active members of that corporation, Messrs. Roger Wheless and Frank Wilson (son of defendant), superintended the construction.
In order to avoid as far as possible the necessity of having to make changes in course of construction, the defendant requested the future lessees to' examine all the garages in the city for ascertaining what kind of building exactly they should need. A special reason for this precaution was that the money for paying for the building would have to be borrowed, and that .it would be easier for defendant to procure it'by means of one loan than by several.
After the contract had been entered into, defendant negotiated a loan of $30,700 to cover the contract price.
Defendant and the future lessees, in fixing the amount of the rent to be paid for the building, based themselves uppn this . contract price; but, knowing that, as the work progressed, changes might have to be made in the original plans which would increase the cost of the building, they inserted in the lease a clause by which, in the event an increase exceeding $2,000 was thus brought about, the rent should be increased by one-twelfth of 10 per cent of whatever the final cost might be- over the contract price.
And in like provision the following clause was added to the building contract:
“It is further mutually agreed that the said Allen V. Wilson shall, at any time" during the progress of the work, have the right to make any changes he may think necessary and shall give a written order for same. The difference in price to be added to, or deducted from the original contract, to be first agreed upon, but should the parties hereto fail to agree as to the amount to be added or deducted on account of said changes, the work shall go on according to the order, and the matter shall be submitted to three (3) arbitrators. Each party to select one (1) arbitrator and these two (2) to select a third. The decision of the majority to be final.”
It is not pretended • tbat in any instance defendant gave a written order, and it is admitted tbat in most instances be did not even give an oral order; but it is contended tbat be authorized tbe changes; tbat be did so actually, or else tacitly by standing by and not objecting.
Defendant does not deny tbat be was at tbe building nearly all tbe time -watching tbe progress of the work, and tbat be knew of tbe changes, and was consulted, with regard to some of them; but be denies tbat *539 he authorized them to he made, or that he agreed to pay for them, except as to a few, which he names, and which he has, he says, never refused to pay for; and, in fact, has paid for.
The Wheless-Wilson Auto Company cannot pay for these extras, it having gone into bankruptcy, so that, unless defendant pays for them, they will redound to his enrichment at plaintiff’s expense.
It is not pretended that the departures from the original plan were in a single instance on the initiative of defendant; always it was the lessees who, in their own interest, for better adapting the building to their own purposes, desired that the changes be made.
None was made without previous discussion, and nearly always, if not always, in the presence and within hearing of defendant; but he is so deaf that, unless spoken to very loud, or close to his ear, he does not hear, so that his having been within hearing is not so significant, unless accompanied by proof of his having heard.
And even then it is not so certain that he did not have the right to remain silent on these occasions, in view of the clauses in the contract that a written order would have to be given for every change to be made, and that an estimate of the probable cost would have to be made.
The ease is not the ordinary one where any changes that might be made would necessarily be in the interest of the owner, and therefore to be paid for by him. Here the changes might be solely in the interest of the lessees, and therefore possibly to be paid for by them. Defendant denies positively on the witness stand that he authorized the changes to be made, except those which he has already paid for. His son, Frank Wilson, corroborates him. Mr. Wheless, called by plaintiff as a witness, may be said to do the same. He testified as follows:
“Q. Well, who communicated to Mr. Garson the desirability of these changes, or variations and extras? A. We discussed, Mr. Frank Wilson and I, he was interested with me in the-management, and my discussion of the various-changes which we considered necessary from time to time was with him, and I usually put it up to Mm to take it up with his father, and I think together that we authorized such changes as were made. Q. You discussed — you knew that Garson Bros, were building the house under plans and specifications? A. Yes,, sir. Q. And from time to time you would see-that it was necessary to have variations and' made extras? A. Yes, sir. Q. Then you saw that it was necessary — when you realized that certain changes would have to be made, you did not give the order straight out to Mr. Garson to do it? A. No, sir; I did not. Q. Who-would you consult? A. I usually consulted Mr. Frank Wilson, and put it up to Mm. Q. Why did you consult him? A. Because he was the-son of the man that was building the building. Q. You expected him to see his father? A„ Yes, sir. Q. Did he? A. I presume so. Q. Did you see them talking together? A. I frequently entered into the discussion as to the necessity of the changes with both of them myself. Q. What would Mr. Allen Wilson say about this, when you went into a discussion about them? A. I do not recall any particular attribute or conversation just now. Q„ When you would enter into a consultation with Mr. Allen V. Wilson about the necessary changes that ought to be made in the building, for a garage — he discussed the matter with, you at time — you took it up with him at times? A. Yes, sir. Q. Did he object? A. No, sir; I do not recall that there was ever any objection. Q. Then you would go and speak to Mr. Gar-son? A. I do not think that I ever gave any instructions to Mr. Garson.”
On cross-examination he said:
“Q. Didn’t Mr. Allen Y. Wilson tell you, before he began the construction of this garage, to go to all of the garages in the city of Shreveport, and determine just what you all wanted, because he did not want any extras on this, building? A. He may have told us that; I do not recollect it. * * * Q. Mr. Allen Wilson did borrow the money to build the building on this property? A. I understood so.. * * * Q. Now didn’t Mr. Frank Wilson and yourself begin to make preparations to have changes made, and don’t you know that Mr. Allen Wilson protested loudly against these- *541 changes, and didn’t you and Frank Wilson tell him that he need not object to them, because the Wheless-Wilson Auto Supply Company would shoulder them and pay for them? A. I do not recall that we did. I do not recall that we said we would pay for the changes. There were certain changes that we had made on our own responsibility, or rather I agreed .to pay for them, in the event that could not be included in the cost of the building, to be paid for by’Mr. Wilson, among those was the mezzanine floor; that was an afterthought; put that in after the building was practically completed. We had to have a display room, did not have room downstairs to display things, and we had the mezzanine floor built; that gave us a display room; and we gave Mr. Garson a copy of our lease and showed him on what authority I requested that change, and told him, if it were impossible for him to get that in on his contract, or in as part of the building, so that we should simply pay rent on the additional cost, then the Wheless-Wilson Auto Supply Company would pay for it, because it had to be done. The basis of the contract the basis for making that request that it be part of the building, was the nature of our lease, and I gave Mr. Garson a copy of it, in which we agreed to lease from Mr. Wilson the building according to plans and specifications for a rental of $400 per month, provided the building cost did not exceed the contract price by more than $2,000, but in the event it should exceed it by more than $2,000, then we were to pay an additional rental of one-twelfth of 10 per cent, on whatever the additional cost was. Now I laid that before' Mr. Garson, and asked him to build the mezzanine floor, and told him that in the event Mr. Allen Wilson would not pay for it, then the Wheless-Wilson Auto Supply Company would.”
Defendant’s son, Frank Wilson, who with Mr. Wheless superintended the work, is positive that his father refused to consent to the-changes if he had to pay for them, and that they were ordered by the Wheless-Wilson Auto Company, to be paid for'by it.
Plaintiff testified in chief that defendant had given orders for some of the changes, and had impliedly or tacitly authorized all of them.
On cross-examination he testified as follows ;
“Q. Now I will read you this clause in the contract filed in evidence by you and marked Exhibit B: ‘It is further mutually agreed that the said Allen V. Wilson, shall at any time during the progress of the work, have the right to make any changes he may think necessary, and shall give a written order for same. The difference in price to be added to or deducted from the original contract, to be first agreed upon, but should the parties hereto fail to agree as to the amount to be added or deducted on account of said changes, the work shall go on according to the order, and the matter shall be submitted to three (3) arbitrators. Each party to select one (1) arbitrator and these two (2) to select a third. The decision of the majority t® bé final.’ You were aware of that clause in your contract, were you not? A. That is in every contract. Q. Did you 'receive any written orders from Allen Y. Wilson to make any changes in this contract? A. I did not. Q. Did you agree upon any price, before any of the changes ordered were made, with Mr. Alíen Wilson? A. I did with Mr. Wilson, an approximate price, and every article there extra I think came under the approximate price I gave. Q. The Mr. Wilson that you refer to was Mr. Frank Wilson? A. No, sir, Mr. Allen Wilson, he gave orders for some of the work. Q. Did Mr. Allen Wilson give orders for any changes at all? A. Yes, sir. Q. Will you designate what changes Mr. Allen Wilson ordered? A. He ordered the plastering and painting, which was not in the contract, he ordered the painting in the basement and new floor in the office, which was not in the contract. Q. Now what other changes, besides those that you have mentioned did Mr. Allen Wilson himself order? A. Well, the skylights was one of the changes that they all talked about. Q. Did not Mr. Allen Wilson object- to the skylights? A. No, sir, never objected to me. Q. Was not the roof already on the building, before the skylights were put in, and didn’t you have to cut away the roof to put them -in? A. No, sir, the roof was not completed before we talked about it, and I waited for them to make a decision, and finally I had to go ahead with the roof, find it was nearly on. Q. The roof was practically on before the skylights were put in, and you had to cut it out to do that work over again? A. Yes, sir. Q. * * * A. A price was made to Mr. Wilson on the skylights, an. approximate price; told him about what it would cost, approximately. Q. Which Mr. Wilson? A. I mean Mr. Allen Wilson. Q. Now I will take thesé things, in order, the way that they are on -the account. Now Mr.
*543 Garson, I will ask you if all of these changes, all of this extra work, was not as a matter of fact ordered by Roger Wheless and Frank Wilson, and not Mr. Allen Wilson. A. They were ordered by all of them collectively, sometimes they were all- together, and talked about them collectively. Mr. Allen Wilson always got the price, what would be the cost to make the changes, the approximate price. Q. I will ask you if they were not all made at the request of Mr. Roger Wheless and Mr. Frank Wilson, and did not Roger Wheless and Frank Wilson agree to pay for these changes? A. No, sir; no one agreed individually. Q. Was not all of these changes made for the benefit of the Wheless-Wilson Auto Supply Company, and not for the benefit of the Wilspn Building? A. I suppose that they were made for the benefit of the tenants. Q. Mr. Garson, I present to you a statement of Garson Bros, for extras presented to Mr. Allen Wilson, and I will ask you if it is not written on this statement, ‘All the above work done by order of Mr. Roger Wheless and Mr. Frank Wilson’? A. They gave me the direct order, Mi-. Allen Wilson is too deaf to talk to, but other orders were given by Mr. Wilson himself. Q. Don’t this statement contain the entire account that you are now asking payment for from Mr. Allen V. Wilson, $6,783.54? A. Yes, sir. Q. Then how do you account for the fact this is written on that statement, ‘All the above work done by orders of Mr. Roger Wheless and Mr. Frank Wilson’? A. Easily account for it, Mr. Allen Wilson is not in condition very well to talk about it, and all direct orders come either from Mr. Frank Wilson or Mr. Roger Wheless. Q. Therefore the orders were not given by Mr. Allen V..Wilson? A. Not all of them; some given direct. Q. Now the extras shown on page 2 of the document attached to your petition, taking out two posts and putting in trusses in workshop, and the' iron work, amounting in all to $675.35? Did Mr. Allen Wilson authorize that change? A. He was there, and talked about it; delayed it a long time, long time before any one could decide whether it was to be done or not. Q. Mr. Garson, is it not a fact that the posts had already been placed in the building under the original contract at the time? A. Yes, sir. Q. Then this change was made for the benefit of the Wheless-Wilson Auto Supply Company in order that they could get around in there with their automobiles that much' easier? A. Yes, sir; I suppose so. Q. Did not Mr. Roger Wheless give you thd orders to do that changing? A. Well, he give the orders personally; Mr. Wilson knew that these orders were being given, and wanted to know how much it would cost, Q. Don’t you know that Mr. Allen Wilson does not know anything that goes on around him, in the way of hearing conversations? A. No, but I talked to him very plainly about it. Q. Is he not about as deaf a man as you ever talked to? A. No, sir; have talked to deafer ones. * * * Q. Did he authorize this change, made on page 2 of this bill attached to the petition, for the taking out of the two posts and putting in the trusses, the iron work from Henderson’s, amounting in all to $675.35? .A. He did not order it in so many words, you might term it in so many words, he was told the price, approximately what it would cost, and he admitted that it was necessary, and he did not say exactly to do it, Mr. Roger Wheless and Frank Wilson are the ones that give the orders. * * * Q. Now let us go to page 3 attached to the petition, ‘To moving ladies’ toilet on other side of wall as agreed and putting in waterproof for shower back, one hundred and eighty-five dollars? A. Yes, sir. Q. Did Mr. Allen Wilson authorize that? A. No; Allen Wilson; it was like the others, we talked it over, and Mr. Roger Wheless authorized it. Q. Now Mr. Allen Wilson did authorize the putting down of the top floor in the office? A. Yes, sir; told me to do that himself. Q. We don’t say that he did not, and are willing to pay that $78.52 — did Mr. Allen Wilson authorize the putting up of two sales offices on first floor, as shown on page 3 of this bill annexed to the petition, which amounted to $68.97, and $8.84? A. He knew the order was given, it was talked over, and the others authorized it, and it was put in without any objections. * * * Q. Now then, let us take up page 4 of the bill annexed to the petition, ‘To putting in five skylights in workshop, seven hundred and fifty-one dollars and twenty-eight cents. Did Allen Wilson either by word of mouth or by writing authorize that change? A. Not by writing, but he authorized it by not objecting when it was talked over, and knew approximately what it would cost. * * * Q. Was not that part of the building in which these skylights were placed, practically completed before you got ready to make these changes? A. No, sir; it was not completed, I was ready three weeks before they were put in, and these parties talked it over, but could not come to a -decision, and. of course in the meantime I had to go on with the work. Q. The work that was done under the- original contract, with which Mr. Wilson was charged, then that work had to be cut out and the skylights put in, and *545 this extra amount of work was also charged to him? A. Yes, sir. Q. And was not that work authorized by Roger Wheless and not Allen Wilson? A. It was ordered by Roger Wheless finally, but it was talked over and discussed by all parties. Q. Now let us take page 5 of the bill annexed to the petition, ‘To extra sash partition on mezzanine floor, one hundred and fifty-seven dollars and twenty-five cents? Did Mr. Allen Wilson, either verbally or in writing, authorize that change? A. No, sir; the only remark he made about that was he says, ‘These boys will break me, if they don’t quit.’ * * * Q. Now on page 6, of the bill annexed to the petition, ‘To putting in concrete curb around pumps and show room inside building and putting in pipe, for wire from post to curb.’ Did Allen Wilson authorize that, either verbally or in writing, amounting to $95.44? A. Not more than the others; it was just talked over. Q. Did Roger Wheless order that change? A. Yes, sir; on part of the building. Q. Now, on page 7 of the bill attached to the petition, ‘To taking out old sidewalk, grading same, cutting and changing stone curb, putting down new sidewalk, foundation for air compressor, and wash platform at rear, two hundred and twenty-seven dollars and thirty-six cents.’ Now did Mr. Allen Wilson — Mr. Wilson did authorize the taking out of the old side walk and grading same, cutting and changing stone curb, and putting down new sidewalk? A. Just the same as the others. Q. Didn’t he give you authority himself to do that? A. Mr. Frank Wilson finally give the order. * * * Q. Did Mr. Allen Wilson, the defendant in this case, authorize the foundation for the air compressor and the wash platform at the rear, as included in the bill attached to the petition on page 7? A. No, sir. Q. Who did authorize that? A. I think either Mr. Wheless or Mr. Frank Wilson. * * * Q. Now on page 11 of the bill, annexed to the petition there is a charge for sidewalk and for mezzanine floor, which shows a total cost of $2,264.65? Now I will ask you did Mr. Allen Wilson, either in writing or verbally, authorize you to make those changes and put those extras on that building? A. No, sir; not more than the others; he did not authorize it either verbally or in writing, any more than we all talked it over, and he said the boys would break him, to pay for it. Q. Now was an estimate made of the cost of that work, just asked about, before the work was done? A. No, sir; just an approximation of what it would cost. Q. Now did not Mr. Roger Wheless authorize that work? A. I think that Mr. Frank Wilson was the one that finally give the order for that work, except the mezzanine floor. ♦ * * Q. Now on page 16 of the bill attached to the petition, ‘Shelving, platform, etc., oil container stand, setting counter shelf and motor stand, lattice work back of pump, amounting to one hundred and twenty-eight dollars and seventeen cents.’ I will ask you if Mr. Allen Wilson authorized that either verbally or in writing? A. No, sir; nothing more than the others. Q. Was that ordered by Roger Wheless? A. I could not say which of the two, I was not paying so much attention to which one ordered it. Q. Now on page 18 of the bill annexed to the petition and page 19, plumbing and extra wiring; were they authorized by Allen Wilson either verbally or in writing? A. No, sir; but they were all necessary to complete the building. Q. On page 20 of the bill annexed to t-he petition, extra items amounting to $291.50 were they authorized by Allen Wilson? A. No, sir. * * * Q. Mr. Garson, prior to the actually doing of these extras, that you have been testifying about, I understand you to say that a discussion was entered into between Mr. Allen Wilson, Mr. Roger Wheless, and Mr. Frank Wilson and yourself, before any work was actually furnished in the matter, as respects these extras? A. Yes, sir, all of us talked about it, and some of the extras I wanted a long while for a decision. Q. When the decision was made the mouthpiece was sometimes Mr. Frank Wilson? A. Yes, sir. Q. Sometimes Mr. Roger Wheless? A. Yes, sir. Q. Who did you understand that they were speaking for — who did you give credit to, in doing this work? A. I give credit to the buildings, as I always do, everything to the building goes with the building. Q. You mean Mr. Allen V. Wilson? A. Yes, sir. Q. Did you charge any of these extras,' either to Mr. Roger Wheless or the Wheless-Wilson Auto Supply Company? A. No, sir; the only statement ever rendered is this statement rendered there. Q. Who did you look to for payment? A. I looked to the building, the owner of the building. * * * Q. During the progress of this work, the extras, you saw Mr. Allen Wilson around every day more or less? A. Yes, sir. Q. He never forbade you or ordered you to stop? A. No, sir. Q. That he would not pay for any of the extras? A. No, sir; said he did not know where he was going to get the money to pay for it. Q. That the boys were demanding a good many alterations? A. Yes, sir; all parts of the building. Q. They were talking to Allen Wilson about it? A. Yes, sir. Q. In consultation? A. Yes, sir; and then I talked to him about it. *547 Q. And he says, ‘these boys will break me if they don’t stop’? A. Yes, sir; he did. * * *
“Q. Now,' did you enter into a discussion with Mr. Wheless relative to the increased rental by the lease showing that Mr. Wilson could exact of them, in the event that the building cost more than the contract price? A. No, sir, no lease read to me but the provision that they showed me — I do not remember that it was showed to me at that special time, but they showed me the lease, that they were authorized to make what changes were necessary for the building and pay for it in rent. Q. Was that one of the things moving you to go ahead and make the changes without Mr. Allen Wilson’s authorization? A. Yes, sir. Q. So then you acted upon the clause in the lease which the Wheless-Wilson Auto Supply Company had, rather than the authorization of Mr. Allen Wilson? A. I had no authorization from Mr. Allen Y. Wilson for any of it. Q. You still contend that Mr. Wilson is indebted to you for this vulcanizing plant? A. No, sir; I thought he was at that time. Q. What do you think about it now? A. Well, now, that is a matter for the court to,decide; whether he does or not, I am. unable to decide.”
This evidence as a whole falls short of showing that defendant agreed to pay for these changes — especially in view of the requirement of the contract that a written order would have to be given for any change from the plan as contracted for.
This suit was filed more than a year after the completion and delivery of the building. Plaintiff testifies that in this interval defendant never contested the correctness of the statement furnished him of the work done on the building, which statement showed these extras in detail, but that defendant on the contrary, made partial payments without demur, and asked for further time in which to make full payment.
Defendant was not questioned with regard to this asking for time and promising to pay, but denied most positively having ever consented to pay for any extras other than the ones which he admits to have ordered. And it is entirely improbable that he consented to pay the entire amount shown by the statement of account in question, since there was included in it the cost of the vulcanizing plant, $343.67, which plaintiff now admits defendant does not owe, and the cost of the mezzanine floor, $2,264.56, which the evidence shows most conclusively was to be paid for by the auto company. Another noteworthy circumstance in that connection is that the cost of these -extras far exceeded the $2,000 mentioned in the lease, so that, if defendant had been liable for same, the rental would have had to be increased, under the terms of the lease, and it was not. And another noteworthy circumstance is that in the statement of' account thus furnished there appears on the page containing the condensed statement of the extras the following ; “All the above work done by orders of Mr. Roger Wheless and Frank Wilson”— going to corroborate defendant’s contention that the extras were not done on his orders, but on those of the lessees. There is nothing to show that at that time the financial standing of the Wheless-Wilson Auto Company was not good; the presumption is that it was, and hence that there was no reason why plaintiff should not have been willing to make the changes in question on the responsibility of that company. The fact that defendant would have to borrow the money to pay for changes was a strong reason for his not wishing to have them made at his •expense. He did consent to some.
In one of the changes we think the defendant must have acquiesced, since it was absolutely necessary for the proper construction of the building, and he saw the work done, and did not object. This was the going deeper for obtaining a secure foundation, which necessitated extra excavation, extra labor, and extra material — the whole amounting to $160.69. Whether the payments made by defendant have covered this extra, as well as those which he admits to have ordered, to wit, the floor in the office, *549 the plastering, and. the painting of the walls, the painting on the outside, and the taking up of the sidewalk, we cannot ascertain from the transcript. For the cost of the extras here named and for the $160.69 just mentioned, plaintiff is entitled to judgment, less whatever amount has already been paid by defendant over and above the $30,700 contract price.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that plaintiff’s demand be rejected except as to the extras mentioned in the last paragraph of this opinion, and that the case be remanded for further trial in accordance with the views herein expressed; and that plaintiff pay the costs of this appeal. The costs of the trial court to await final judgment.
Rehearing denied by the WHOLE COURT.